DECISION
This case is before the Court pursuant to an appeal taken by the defendant from an order regarding the setting of a restitution amount made by the Special Master pursuant to R.I.G.L. § 8-2-39 (e). The decision was rendered on August 22, 1995.
Travel of the Case
On October 6, 1992, John J. Tillinghast (defendant) entered a plea of nolo contendere in response to four charges of receiving stolen liquid gold and gold salts from four companies: Plastic Craft Novelty Co., Inc. (Plastic Craft), the Robbins Company (Robbins), Anson Incorporated, and National Plating Company. This Court accepted the plea and sentenced the defendant to three years' probation on each count to run concurrently. As one of the conditions of probation, this Court ordered restitution. The determination of restitution was referred to the Master. Plastic Craft and Robbins were the only two victims who sought restitution.
The Master heard the matter on March 14, 1995, and rendered a decision on August 22, 1995. The Master made the following findings:
Company Gold stolen Amount Returned Amount Owed
1) Plastic Craft 281 oz. 22 oz. 259 oz. 2) Robbins 40 oz. 18 oz. 22 oz. 3) Anson 35 oz. 25 oz. 0[1]
4) National Plating 3 oz. 3 oz. 0 5) Style Craft 1 oz. 1 oz. 0
The Master used the then current market value of gold ($390 per ounce) to determine the amount owed each victim in restitution. The Master decided that the defendant owed Plasti Craft $75,500[2] and Robbins $8,580.[3] The defendant disputes the amount of restitution ordered for Plastic Craft but is in agreement that he owes Robbins $8,580.
Pursuant to R.I. General Laws § 8-2-39 (e), the defendant appeals the Master's decision.
Facts
In November of 1991, Mr. Peter Manickas (Manickas), the vice president of Plastic Craft, hired Mr. Gino DiCarlo (DiCarlo), as head plater at Plastic Craft. When DiCarlo applied for this position, he received a job reference from the defendant, who was then a sales representative with Summit Manufacturing. Shortly after DiCarlo was hired, the company observed a marked increase in the amount of gold purchased and used in the plating process in relation to its sales figures.
Plastic Craft only ordered gold on an as-needed basis and it had no inventory. As head plater, DiCarlo was responsible for forwarding gold purchase order requests to the president of Plastic Craft, who would in turn order the gold. DiCarlo would receive all the gold intended for use in the plating process.
Manickas testified that historically gold usage at Plastic Craft conforms to a range of 3 to 4 percent of jewelry sales. This percentage is the financial basis upon which Plastic Craft has operated in the past and continues to operate. During the five months of DiCarlo's employment in 1992, gold usage as a percentage of sales sharply increased to a monthly average of 18 percent. This was highly unusual because the monthly average for the same five months in the previous two years was 3.34 percent in 1990 and 3.62 percent in 1991. Moreover, at no time in the previous two years did gold use ever climb above 10 percent for any given month. The rise in this percentage was so unusual because the amount of gold used in the plating process is very uniform and is subject to only small variations.
As a result of the increased gold usage and frequent contacts between DiCarlo and the defendant, Plastic Craft became suspicious and had DiCarlo placed under surveillance. Shortly thereafter, on May 14, 1992, DiCarlo and the defendant were arrested for stealing gold from Plastic Craft. The defendant was in the process of receiving 7 ounces of stolen Plastic Craft gold from DiCarlo when they were arrested. The defendant cooperated with the Cranston Police based on the promise of a less than jail sentence recommendation. He signed a consent to search his residence and the police recovered 85 ounces of stolen gold belonging to the four companies. Defendant made a written confession to the Cranston Police admitting to receiving the stolen gold from these companies. In his confession defendant admits to receiving up to 3 ounces a week of stolen Plastic Craft gold from DiCarlo over a six-month period.
Defendant Tillinghast's Appeal
The defendant disputes the Master's finding regarding both the amount of gold stolen from Plastic Craft and the value of its loss. The defendant argues that the order for payment of restitution to Plastic Craft is contrary to the evidence submitted at the hearing. First, because there was and is no evidence that Plastic Craft suffered a loss of $136,000 due only to the theft of gold, and second, because there was and is no evidence that the defendant was involved in the theft of $136,000 worth of gold. Additionally, the defendant believes that the order fails to take into consideration his ability to make restitution and incorrectly credits certain setoffs.
The defendant is not appealing the order of payment for restitution in regard to Robbins. The defendant admits to illegally receiving 40 ounces of stolen gold from Robbins. In fact, the defendant and Robbins are in agreement as to the value of the loss suffered by Robbins.
The defendant maintains that there is no reliable evidence that he received more than 43 ounces of stolen gold from Plastic Craft. The defendant notes that he testified from first-hand knowledge that he was involved in the theft of only that amount. He states that he kept a log to keep track of how much gold he received and sold, so he is sure of the 43 ounces amount. He admits, however, that this evidence is not available since he destroyed the log.
The defendant contends that the statement he gave to the Cranston Police does not discredit his testimony that he received only 43 ounces of stolen Plastic Craft gold over four months. The statement the defendant made reads as follows, "I have been meeting with Gino DiCarlo every week for about six months to buy one, two or three at 70 percent of market price." (Transcript at 46.) The defendant believes the Master interprets this statement to mean that he received 3 ounces of gold every week, while he stated that he received "one, two or three ounces" every week. Furthermore, the defendant argues that the statement "about six months" was not meant to be precise. He explains that he was physically and emotionally exhausted at the time he gave the statement, and that upon reflection he realized the relevant time period was four months.
The defendant believes that Manickas' testimony that the defendant was involved in the theft of approximately 300 ounces of gold is not competent evidence. The defendant indicates that this testimony was based exclusively on Manickas' own accounting analysis that Plastic Craft suffered a loss of approximately $136,000 during this time period, and that the defendant and his employee DiCarlo admitted to stealing some gold in this same time period. The defendant contends that Manickas makes false assumptions in arriving at his figures. Since the defendant was involved in the theft of some amount of gold, this does not connect him to the theft of all losses suffered by the company at that time. The defendant notes that the only evidence that any part of the loss was due to theft was the defendant's testimony he received 43 ounces of stolen Plastic Craft gold. Plastic Craft did not offer any testimony as to the theft of any other gold during that time period. Consequently, the defendant feels Manickas' connecting the defendant to all losses Plastic Craft suffered is mere conjecture.
The defendant indicates that it would be just as reasonable to believe that Plastic Craft's losses resulted from overusage of gold, that some of the gold shipped to Plastic Craft was never received, that reported sales were inaccurate, or that there was a bookkeeping error. The defendant explains that just because Manickas believes all losses were due to theft does not make it so.
The defendant claims that even if it were reasonable to infer that all losses suffered by Plastic Craft during this time period were attributable to theft, which defendant maintains it is not, then to tie defendant into the loss would require a further inference that defendant was involved in all thefts at Plastic Craft. The defendant argues that it is possible that DiCarlo or others were involved in additional thefts. The defendant states that it is impermissible and unreasonable to infer from the evidence presented that all of the loss is attributable to the defendant.
The defendant also argues that the Master fails in his decision to consider the defendant's ability to pay and make restitution. The Master indicated that he intended to consider this matter at another time.
The defendant's final argument is that the Master incorrectly credits certain setoffs. The defendant believes the 36 ounces of stolen gold now in possession of the Cranston Police was correctly setoff against the amount owed to the two victims. The Master decided that the 36 ounces of gold would be prorated among the two victims, even though the defendant testified that this gold belongs to Robbins. Furthermore, the gold was tested and it was determined that the remaining gold was not of the type purchased by Plastic Craft. The defendant also testified that the remaining gold was seized in the kind of plastic bag container he received from Robbins and not the bottle type of container received from Plastic Craft. The defendant indicates that there is no evidence that the remaining 36 ounces of gold belongs to any entity other than Robbins, and this should be setoff against the amount owed to Robbins.
The State's Argument
The State argues that the Master's order concerning restitution amount is supported by substantial, direct, and relevant evidence. The State also argues that the Master weighed all the evidence and credibility of the witnesses in coming to the conclusion that Plastic Craft "suffered a major loss because of the defendant and his confidant on the inside."
The State's position is that on the issue of credibility the Master gave great weight to the testimony of Manickas and no weight to the testimony of the defendant. The State claims that the Master found Manickas to be very credible and relied heavily on the information provided by him. The State notes that Manickas is a businessman with 15 years' experience as vice president of Plastic Craft. He testified as to the financial and manufacturing operation of the company, things he clearly had personal knowledge of. The Master took notice of Manickas' testimony that there could be no other cause for the increased percentage of gold use other than the ongoing theft of gold from the company.
The State contends that Manickas' testimony clearly supports the Master's decision as to the amount of loss. Manickas arrived at the figure for loss by comparing the gold used in the manufacturing process as a percentage of sales during the five months in question. Manickas then compared this to the historical percentage of gold used as a percentage of sales over the preceding two years. Manickas testified that the historical averages had been rather constant except for the five months in question. He estimated the loss of gold to be between 280 ounces and 315 ounces.
The State believes that the Master did not find the defendant credible and had substantial basis to reject his testimony. The State explains that the defendant insists he received only 43 ounces of gold, yet the testimony bears out that he was the focal point of a systematic organized criminal enterprise. The facts show that the defendant at various times was coordinating the thefts and receipts of gold of five different companies. The police found a storehouse of stolen goods located at his residence, and business was so good he kept a log of all activity.
The State maintains that defendant's confession to police admitting to receiving up to 3 ounces a week of stolen Plastic Craft gold for a six-month period, undermines his current position that he received only 43 ounces over a four-month period. The State believes it is highly unlikely one would overestimate the extent of his crime to the police. The facts concerning his arrest further undermine his credibility on the 43 ounces' issue. On the day he was arrested, he was receiving 7 ounces of stolen Plastic Craft gold and had an additional 14 ounces of stolen Plastic Craft gold warehoused at his home. The State notes that this is just a snapshot of one day in a four to six month period. Furthermore, the State claims that the defendant's argument that the log he kept would have confirmed that he received 43 ounces of Plastic Craft gold is baseless. The defendant was the one who destroyed the log, and this was done after he promised to cooperate with the police if they would recommend a less than jail sentence.
The State requests that this court uphold the decision of the Master. It is the State's position that competent evidence was presented to the Master to support his findings concerning: 1) the amount of the loss, 2) that the loss was caused by the theft, and 3) that the defendant received the stolen gold. The State contends that these findings are not speculative or impermissible inferences. The State believes the findings are clearly supported by the evidence and, in fact, are the only logical and rational inference to be made from the evidence
Regarding the ability to pay restitution, the State believes this issue can be addressed after the final restitution decision has been made. The State's stance on the setoff of the seized gold is that it is a matter for the two victims to argue to the Court.
Robbins Company Argument
Robbins addresses only the setoff issue. Robbins notes that it and the defendant are in agreement that 40 ounces of stolen Robbins' gold was received by the defendant. They also agree that 18 ounces have been returned and that 22 ounces are now due.
Robbins asserts that the uncontroverted evidence is that the 36 ounces of stolen gold now in possession of the Cranston Police belongs to them. The defendant testified that he believed the gold was Robbins'. Additionally, the gold was tested and determined not to be Plastic Craft's.
Robbins believes it would be equitable for the court to order:
 1) The white powdery substance held by the Cranston Police Department to be refined by Technics, Inc., and that the cost of refining be deducted from the gold's yield.
 2) That $8,580 of the total amount yielded as the result of the refining be paid to Robbins as full and final payment of its loss, and that the remainder thereof be paid to Plastic Craft as partial compensation for its loss.
 3) In the event the refined gold yields an amount less than the $8,580 due Robbins, then Robbins would assert that entire refined amount be paid to it as partial compensation for its loss.
Plastic Craft's Argument
Plastic Craft contends that the defendant's memorandum misstates the testimony of Manickas and many of the facts. Plastic Craft, however, fails to indicate what testimony and facts have been misstated.
Plastic Craft only really addresses the setoff issue. Plastic Craft states that it is not clear to it why the defendant would have any say in how the seized contraband should be distributed. Plastic Craft believes the Master's decision with regard to victims' proceeds should be affirmed since appeal law covers the defendant only and not the covictims. Plastic Craft notes that Robbins did not disagree with the Master's original decision to prorate the seized gold. Plastic Craft claims that Robbins never proved, independent of the defendant's testimony, that the seized gold was theirs. The analysis done on the gold only proved it was not Plastic Crafts, not that it belonged to Robbins. Plastic Craft reasons that the remaining gold could also have come from one of the other three victims.
Plastic Craft states that unless the defendant intends to make all the victims immediately and simultaneously whole, the seized contraband should be distributed in a pro-rated manner. Plastic Craft believes it would be unfair to make one victim whole while requiring the other victim to wait months, if not years, to be compensated.
Master's Decision Regarding Restitution
This Court finds as a fact that there is sufficient evidence to support the Master's finding that Plastic Craft suffered a loss of 281 ounces of gold. However, in this case, the amount of gold loss must be approximated. The accounting analysis provided by Manickas used to arrive at the figures for the amount of loss seems to be reliably accurate. Manickas estimated that the loss of gold due to the thefts was between 280 ounces and 315 ounces. The Master determined the loss as the lowest estimate of probability and decided that Plastic Craft's loss was 281 ounces of gold. In U.S. v. Savoie, the court stated, "so long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." 985 F.2d 612, 617 (1st Cir. 1993).
The evidence before the Master was limited to representations made by each party's counsel and the testimony of Manickas and the defendant. The Master in rendering his decision stated,
 "This Court weighed all the evidence, and the credibility of the witnesses, the information brought in, and the court is reasonably satisfied that Plasticraft . . . suffered a major loss because of the actions of [defendant] Mr. Tillinghast and his confederate on the inside. The court has relied heavily on the credibility and detailed information provided by Mr. Manickas . . . ." (Decision, p. 7.)
This Court finds as a fact that it was reasonable for the Master to give great weight to the testimony and information provided by Manickas. If anyone is qualified to determine the amount of loss Plastic Craft suffered, it is Manickas. Manickas is an experienced business person who has worked for Plastic Craft for over 15 years. He is very familiar with the inner workings of that company.
The Master reasonably found the charts provided by Manickas to be the best evidence of Plastic Craft's loss. The only way Plastic Craft keeps track of its gold usage is through the dollars of gold as a percentage of sale. The charts clearly demonstrated that gold usage at Plastic Craft historically conformed to a range of 3 to 4 percent of jewelry sales. These percentages changed dramatically after the defendant was hired by Plastic Craft. The gold usage as a percentage of sales climbed to an average of over 18 percent for the five months the defendant worked for the company. Previously these figures had always been relatively constant, never rising above 10 percent for any month. Manickas testified that he believed there could be no other cause for the increased percentage of gold use other than the ongoing theft.
There appears to be no way to explain these huge losses of gold in relation to the percentage of sales except due to theft. It is not reasonable to believe that the losses resulted from the overusage of gold. Manickas testified that during the period of defendant's employment, the product line never changed, and the amount of gold placed in the jewelry pieces remained constant. He noted that there are timers on the company's gold baths, so there is no way there could be differences in the amount of gold used because one employee was using a different amount of gold than other employees. (Transcript at 53-54.)
It is also not reasonable to conclude that some of the gold shipped to Plastic Craft was not received. All of the gold purchased by Plastic Craft was from Technic, Inc. Manickas testified that Technic, Inc. is a reliable and reputable company. He stated, "so I have no reason to doubt that every invoice I have and every packing slip I have thats (sic) stapled to it that we paid for, was in fact received." (Transcript at 62.) Moreover, there is no evidence on the record that Plastic Craft or any other company has ever had any problem with ordered gold not being received from Technic, Inc.
Additionally, the Court finds that reported sales were accurate and that there were no bookkeeping errors. The figures on the charts estimating the amount or gold loss due to theft were taken directly from the financial statements of Plastic Craft. These statements historically had been correct and Manickas stands by the accuracy of these figures. Manickas indicated that he rechecked the financial statements and all computations and found no errors.
The defendant testified that for a shop the size of Plastic Craft it would be impossible for Plastic Craft to order as much gold as it has alleged. (Transcript at 38.) The defendant explained that if Plastic Craft had ordered that much gold it would be impossible to plate that much goods. The defendant appears to be insinuating that if 281 ounces of additional gold had been ordered during the five months in question, the purchases would have been so out of line with usual purchases that Plastic Craft would have known of improprieties without even checking its balance sheets. Manickas maintained, however, that since they were doing more business they were not alarmed by the amount of gold purchased. (Transcript at 68.) He claimed they became suspicious only when they discovered the amount of gold purchased in relationship to sales was out of line.
The defendant argues that even though he admitted to being involved in some thefts, this does not connect him to the theft of all losses. He claims that DiCarlo was stealing gold on his own. He testified that DiCarlo told him that he was giving gold to someone else. The Master did not find the defendant's claim credible. The defendant was unable to produce the names of these alleged third parties and admitted he never actually saw any of these transactions take place.
This Court finds that the Master, for the purposes of this hearing, correctly concluded that the defendant was involved in all of the thefts and receipts from Plastic Craft. The facts show that the defendant originally helped DiCarlo get the job at Plastic Craft. He was the one who was the focal point involving the thefts of five different companies. He was the one running the large operation from a storehouse located at his home. Aside from the defendant's own testimony there is simply no evidence that DiCarlo sold gold to anyone else but the defendant. The Master had substantial basis to conclude the defendant was part of the theft of all losses.
It appears that the Master simply did not find the defendant very credible. The fact the defendant is arguing he received only 43 ounces of gold after earlier confessing to police that he received up to 3 ounces of stolen gold a week for six months undermines his credibility. His credibility is further called into question given that he was receiving 7 ounces of stolen gold on the day he was arrested. This is significantly more than the 1, 2 or 3 ounces of stolen gold.
The Court upon review of the record finds that the evidence supports the Master's decision with regard to the amount of restitution and to the method of setoff determined by the Master.
The case is hereby remanded to the Special Master for implementation of his decision and for a determination of defendant's ability to pay said restitution.
[1] Anson was compensated by its insurance carrier.
[2] Figure represents amount owed ($259 oz.) multiplied by the fair market value of gold ($390) minus monies received from DiCarlo ($25,500).
[3] Figure represents amount owed (22 oz.) multiplied by the fair market value of gold ($390).